

ENTERED
01/31/2017

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| SEAN MICHAEL MCPHILAMY, *et al* | § | CASE NO: 16-10238 |
| Debtors | § | |
| | § | CHAPTER  13 |

**MEMORANDUM OPINION**
**GRANTING CONFIRMATION OF DEBTORS' CHAPTER 13 PLAN**
**&**
**<u>DENYING CHAPTER 13 TRUSTEEE'S MOTION TO DISMISS</u>**
[*Resolving ECF No.* **23, 21**]

**<u>I. INTRODUCTION</u>**

Congress's enactment of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("***BAPCPA***")—specifically the hanging paragraph of 11 U.S.C. § 1325(a) (the "***hanging paragraph***")—creates two exceptions that limit a debtor's right to cramdown certain claims in a chapter 13 plan.  Often, it falls to the courts to determine if a particular claim falls within either of the hanging paragraph's two exceptions.  This is one such case.  It comes down to this: should the Court confirm a chapter 13 plan in which Sean & Bertha McPhilamy ("***Debtors***") propose to treat certain secured cross-collateralized claims of Rio Grande Valley Federal Credit Union ("***RGVFCU***") in motor vehicles purchased for the personal use of the Debtors within 910 days, and in some cases, within one year of filing bankruptcy where the amount of the secured claim exceeds the value of the vehicles as wholly unsecured claims?  Debtors have two personal vehicles that are cross-collateralized in five different loans.  RGVFCU has not opposed confirmation, however, the chapter 13 trustee ("***Trustee***") expressed concern as to whether the loans in question may be treated as wholly unsecured pursuant to the hanging paragraph.

Seeking clarification of the application of § 1325(a), the parties look to this Court to determine whether the Debtors' chapter 13 plan is confirmable.  Specifically, the Court is presented with two issues: to wit, (1) whether the cross-collateralized loans are purchase-money security interests, and (2) whether personal motor vehicles can be considered "other thing[s] of value" under the hanging paragraph's second exception.  Accordingly, this Court now considers the parameters of the Bankruptcy Code,[1] specifically the hanging paragraph, relevant case law, and the arguments lodged by the Debtors to determine whether Debtors' chapter 13 plan is confirmable.

## II.  FINDINGS OF FACT

This Court makes the following Findings of Fact and Conclusions of Law pursuant to Fed. R. Bankr. P. 7052, which incorporates Fed. R. Civ. P. 52, and 9014.  To the extent that any Finding of Fact constitutes a Conclusion of Law, it is adopted as such.  To the extent that any Conclusion of Law constitutes a Finding of Fact, it is adopted as such.   If there is an inconsistency, this Memorandum Opinion controls.

Debtors filed for relief under chapter 13 of title 11 of the Code on July 29, 2016.  [ECF No. 1].  Debtors filed a chapter 13 plan in conjunction with their petition.  [ECF No. 2] (as amended by [ECF No. 23]) (the "***Plan***").  The Trustee filed a Motion to Dismiss or Convert on September 28, 2016, due to alleged deficiencies in the proposed Plan and Debtors' alleged delays in filing amendments to the proposed Plan and Schedule I.  [ECF No. 21].  RGVFCU filed the following seven Proofs of Claim:

  i. Claim No. 7 in the amount of $1,704.50 secured by a 2015 Honda Civic (the

---

[1] Any reference to "Code" or "Bankruptcy Code" is a reference to the United States Bankruptcy Code, 11 U.S.C., or any section (i.e. §) thereof refers to the corresponding section in 11 U.S.C.

"*Civic*").  The loan was executed on August 14, 2015, which was both within 910 days and one year of filing bankruptcy and was valued by RGVFCU in the amount of $15,950.00.  In Part 2, Section No. 8 of the proof of claim, it states that the basis for the claim was "Money loaned/Cross Collateralized with 2015 Honda Civic;"

ii.    Claim No. 8 in the amount of $14,618.80 secured by a 2015 Chevrolet Camaro (the "*Camaro*").  The loan was executed on April 7, 2016, which was both within 910 days and within one year of filing bankruptcy and was valued by RGVFCU in the amount of $18,600.00.  In Part 2, Section No. 8 of the proof of claim, it states that the basis for the claim was "Money loaned/Cross Collateralized with 2015 Chevrolet Camaro;"

iii.    Claim No. 9 in the amount of $5,327.90 secured by the Camaro.  The loan was executed on April 18, 2016, which was both within 910 days and within one year of filing bankruptcy and was valued by RGVFCU in the amount of $18,600.00.  In Part 2, Section No. 8 of the proof of claim, it states that the basis for the claim was "Money loaned/Cross Collateralized with 2015 Chevrolet Camaro;"

iv.    Claim No. 10 in the amount of $18,001.05 secured by the Civic.  The loan was executed on August 14, 2015, which was both within 910 days and one year of filing bankruptcy and was valued by RGVFCU in the amount of $15,950.00.  In part 2, Section No. 8 of the proof of claim, it states that the basis of the claim was a "Vehicle loan."  Debtors admit that the loan was used to purchase the Civic. The attached Loan and Security Agreements list the Civic as the collateral.  The

Texas Certificate of Title and NADA Vehicle Information for the Civic are attached;

v.  Claim No. 11 in the amount of $3,024.64 secured by the Camaro.  The loan was executed on May 17, 2016, which was within 910 days, but not within one year of filing bankruptcy and was valued by RGVFCU in the amount of $18,600.00.  In Part 2, Section No. 8 of the proof of claim, it states that the basis for the claim was "Money loaned/Cross Collateralized with 2015 Chevrolet Camaro;"

vi.  Claim No. 12 in the amount of $24,109.02 secured by the Camaro.  The loan was executed on July 30, 2015, which was both within 910 days and one year of filing bankruptcy and was valued by RGVFCU in the amount of $18,600.00.  In Part 2, Section No. 8 of the proof of claim, it states that the basis for the claim was "Money Loaned/Cross Collateralized with 2015 Chevrolet Camaro."  The attached Loan and Security Agreement lists the Camaro as the collateral for the loan.  The Texas Certificate of Title and NADA Vehicle Information for the Camaro are attached;

vii.  Claim No. 13 in the amount of $3,826.96 secured by the Camaro.  The loan was executed on July 20, 2015, which was within 910 days but not within one year of filing bankruptcy.  RGVFCU valued the Camaro at $18,600.00. In Part 2, Section No. 8 of the proof of claim, it states that the basis for the claim was "Money Loaned/Cross Collateralized with 2015 Chevrolet Camaro."

*See* [Claim Nos. 7-1, 8-1, 9-1, 10-1, 11-1, 12-1, 13-1].

Each of RGVFCU's loans contains a clause which discusses cross-collateral, which

provides the following:

> What The Security Interest Covers/Cross Collateral Provisions – The security interest secures the Loan and any extensions, renewals or refinancings of the Loan.  If the Property is not a dwelling, the security interest also secures any other loans, including any credit card loan, you have now or receive in the future from us and any other amounts you owe us for any reason now or in the future, except any loan secured by your principal residence.  If the Property is household goods as defined by the Federal Trade Commission Credit Practices Rule or your principal residence, the Property will secure only this Loan and not other loans or amounts you owe us.

[Claim No. 7-1 at 6]; [Claim No. 8-1 at 6]; [Claim No. 9-1 at 6]; [Claim No. 10-1 at 6]; [Claim No. 11-1 at 6]; [Claim No. 12-1 at 6]; [Claim No. 13-1 at 6].  The Truth in Lending Disclosure included with each loan further states:

> Security: Collateral securing other loans with the credit union may also secure this loan.  You are giving a security interest in your shares and dividends and, if any, your deposits and interest in the credit union; and the property described below[.]

[Claim No. 7-1 at 4]; [Claim No. 8-1 at 4]; [Claim No. 9-1 at 4]; [Claim No. 10-1 at 4]; [Claim No. 11-1 at 4]; [Claim No. 12-1 at 4]; [Claim No. 13-1 at 4].

On October 3, 2016, Debtors filed both an amended chapter 13 plan ("*Amended Plan*") and Amended Schedules A, B, C, C-1, I and J.  [ECF Nos. 23, 22].  Debtors list the current value of the Civic—Mrs. Bertha McPhilamy's personal vehicle—as $15,950.00 on Schedule B.  [ECF No. 22 at 1].  RGVFCU lists the value of the Civic as $15,950.00 and the amount of the claim as $18,001.05.  [Claim No. 10-1 at 2].  Debtors list the current value of the Camaro—Mr. Sean McPhilamy's personal vehicle—as $18,600.00 on Schedule B.  [ECF No. 22 at 1].  RGVFCU lists the current value of the Camaro as $18,600.00 and the amount of the claim as $24,109.02.  [Claim No. 12-1 at 2].

The treatments of the RGVFCU claims are set forth in Sections No. 5 and 8 of the

Amended Plan. [ECF No. 23]. Section No. 5 of the Amended Plan treats Claims No. 10 and 12 as "910 Claims"—or debts that were incurred within 910 days preceding the petition date and secured by a lien on a motor vehicle—for which full payment with interest at the rate of 5.5% will be provided. *Id.* at 5. Claim No. 10 documents RGVFCU's $18,001.05 loan to Debtors, which was used to finance the Civic. [Claim No. 10]; *see also* [ECF No. 31 at 3]. Similarly, Claim No. 12 lists the balance owed on the Camaro at $24,109.02 and represents the loan Debtors' used to refinance the Camaro. [Claim No. 12]; *see also* [ECF No. 31 at 3-4]. Conversely, section No. 8 sets forth RGVFCU's remaining five "cross collateralized" claims and lists the total value of the collateral at $0.00 for each claim. [ECF No. 23 at 6]; *see also* [Claim No. 7-1 at 4–6, 8-1 at 4-6, 9-1 at 4–6, 11-1 at 4–6, and 13-1 at 4–6] (the "***Cross-Collateralized Loans***"). Based on section No. 8 of the Amended Plan, RGVFCU's claims as to the Cross-Collateralized Loans—although secured—would be treated as wholly unsecured and would receive a 4% dividend along with the general unsecured class of creditors. [ECF No. 23 at 6]; [ECF No. 31 at 4]. RGVFCU has not objected to the Amended Plan.

On October 5, 2016, this Court held a confirmation hearing on Debtors' Amended Plan. At the hearing, the Trustee requested guidance as to whether the Plan is confirmable based on the Cross-Collateralized Loans' treatment as unsecured claims. Debtors' Counsel argued that the Cross-Collateralized Loans are not purchase-money security interests, which renders the hanging paragraph inapplicable. The Court questioned Debtors' Counsel regarding whether the second exception of the hanging paragraph applied because several of the Cross-Collateralized Loans were incurred within a year of filing bankruptcy. Debtors' Counsel argued that the phrase "any other thing of value" excludes motor vehicles. The Court granted Debtors' Counsel leave to

brief the issue.   On October 26, 2016, Debtors filed an Answer to the Trustee's Motion to Dismiss requesting the Court deny the motion because the necessary amendments had been filed. [ECF No. 30]; *see also* [ECF Nos. 22, 23].   Debtors filed their Brief in Support of Confirmation ("***Brief***") on October 27, 2016.   [ECF No. 31].   Debtors' Brief presents two arguments in support of confirmation: to wit, that the Cross-Collateralized Loans are not sheltered by the hanging paragraph of § 1325(a) because (1) the loans are not secured by a purchase-money security interest and (2) motor vehicles are not "any other thing of value."   *Id.* at 4–9.

This Court held a hearing regarding both confirmation and dismissal of Debtors' Amended Plan on November 2, 2016.   Debtors' Counsel reiterated the arguments presented in the Brief: namely, that the hanging paragraph is inapplicable to the Cross-Collateralized Loans because the loans lack a close nexus required by Texas State Law.   Specifically, Debtors' Counsel alleged that the Cross-Collateralized Loans were taken out to pay legal bills and for out-of-state travel for a family member's illness and therefore are not purchase-money security interests.   Additionally, Debtors' Counsel alleged that the second exception of the hanging paragraph is inapplicable because there is no purchase-money security interest in question, and motor vehicles cannot be construed as "any other thing of value."   At the conclusion of the hearing, the Court took the matter under advisement.   Briefing has now closed and the matter is ripe for consideration.

### III.  LEGAL STANDARD

Bankruptcy courts have an independent duty to determine whether a plan complies with the Code, regardless of whether the parties object or are in agreement.   *In re Sierra*, 560 B.R. 296, 302 (Bankr. S.D. Tex. 2016) (citing *In re Divine Ripe, LLC*, 554 B.R. 395, 410 (Bankr. S.D.

Tex. 2016)).  The requirements of plan confirmation are governed, in part, by the parameters of

§ 1325.   A chapter 13 plan that includes treatment of an allowed secured claim shall be

confirmed if either the creditor accepts the plan or the debtor surrenders the property to the

creditor.   § 1325(a)(5)(A), (C).  Additionally, a debtor may confirm a plan without a secured

creditor's consent or surrendering the property if the plan complies with the requirements of

§ 1325(a)(5)(B).  In relevant part, the court shall confirm a plan if the plan provides that:

> (I) the holder of such [a secured] claim retain the lien securing such claim until
> the earlier of—
>
> (aa) the payment of the underlying debt determined under nonbankruptcy law; or
>
> (bb) discharge under section 1328; . . . [and]
>
> (ii) the value, as of the effective date of the plan, of property to be distributed
> under the plan on account of such claim is not less than the allowed amount of
> such claim . . . .

§ 1325(a)(5).  *See also In re Dale*, 582 F.3d 568, 570 (5th Cir. 2009) (noting that "[u]nder the

code, a lien creditor generally holds a secured claim only to the extent of the present value of the

collateral that the lien encumbers").  Regarding allowed secured claims, the Code instructs that:

> An allowed claim of a creditor secured by a lien on property in which the estate
> has an interest . . . is a secured claim to the extent of the value of such creditor's
> interest in the estate's interest in such property . . . and is an unsecured claim to
> the extent that the value of such creditors interest or the amount so subject to
> setoff is less than the amount of such allowed claim.

11 U.S.C. § 506(a)(1).  The utilization of § 506 in conjunction with § 1325(a)(5)(B) is known as

"bifurcation and cramdown because the secured claim is reduced to the present value of the

collateral, while the remainder of the debt becomes unsecured, forcing the secured creditor to

accept less than the full value of its claim."  *In re Dale*, 582 F.3d at 572.

As part of Congress' enactment of BAPCPA, the hanging paragraph was added following

§ 1325(a)(9) to reduce a debtor's ability to bifurcate and cramdown certain secured claims.  *Id.*

The hanging paragraph provides:

> section 506 shall not apply to a claim . . . if the creditor has a purchase money
> security interest securing the debt that is the subject of the claim, the debt was
> incurred within the 910-day period preceding the date of the filing of the petition,
> and the collateral for that debt consists of a motor vehicle . . . acquired for the
> personal use of the debtor, or if collateral for that debt consists of any other thing
> of value, if the debt was incurred during the 1-year period preceding that filing.

§ 1325(a).

## IV.  CONCLUSIONS OF LAW

### A.  Jurisdiction & Venue

This Court holds jurisdiction pursuant to 28 U.S.C. § 1334, which provides "the district

courts shall have original and exclusive jurisdiction of all cases under title 11."  Section 157

allows a district court to "refer" all bankruptcy and related cases to the bankruptcy court, wherein

the latter court will appropriately preside over the matter.  28 U.S.C. § 157(a); *see also* In re:

Order of Reference to Bankruptcy Judges, Gen. Order 2012-6 (S.D. Tex. May 24, 2012).  In the

instant case, the Court is determining whether the Debtors' Amended Plan is confirmable

pursuant to the Code.  As such, this is a core matter as it pertains to the confirmation of a chapter

13 plan, which inherently can only occur in bankruptcy proceedings.  § 157(b)(2)(L); s*ee also In*

*Re Southmark Corp.*, 163 F.3d 925, 930 (5th Cir. 1999).[2]

This Court may only hear a case in which venue is proper.  28 U.S.C. § 1408.  In their

petition, Debtors listed their residence as Harlingen, Texas.  [ECF No. 1].  Therefore, venue is

proper.

### B.  Constitutional Authority To Enter A Final Order

---

[2] "[A] proceeding is core under section 157 if it invokes a substantive right provided by title 11 or if it is a
proceeding that, by its nature, could arise only in the context of a bankruptcy case."

This Court has an independent duty to evaluate whether it has the constitutional authority to sign a final order. *Stern v. Marshall*, 131 S. Ct. 2594 (2011). *But see Wellness Int'l Network v. Sharif*, 135 S. Ct. 1932, 1938–39 (2015) (holding that parties may consent to jurisdiction on non-core matters). The crux of the instant case involves determining whether to confirm or deny confirmation of Debtors' Amended Plan. *See generally* [ECF No. 31]. Having determined that the instant case involves a core matter, this Court acknowledges the issues *Stern* presents. 564 U.S. at 473–74. "An order denying confirmation of a proposed chapter 13 plan is not a final order and therefore does not implicate the concerns raised in *Stern*." *In re Sierra*, 560 B.R. 296, 300 (Bankr. S.D. Tex. 2016) (citing *Bullard v. Blue Hills Bank*, 135 S. Ct. 1686, 1692 (2015)). Conversely, plan confirmation "has preclusive effect" because the terms become binding on the debtor and creditors, thereby resulting in a final order. *Bullard*, 135 S. Ct. at 1692 (citing 11 U.S.C. § 1327(a)); *see also United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260, 275 (2010). As plan confirmation is a quintessential issue created by federal bankruptcy law, this Court possess the necessary constitutional authority to enter a final order confirming Debtors' Plan. *See In re McCarthy*, 554 B.R. 388, 389–90 (Bankr. W.D. Tex. 2016) (finding that pursuant to *Bullard* bankruptcy courts have "the authority to hear and enter orders regarding a debtor's chapter 13 plan").

**D. The Cross-Collateralized Claims are not Subject to the § 1325(a) Hanging Paragraph because the Claims are not Secured by a Purchase-Money Security Interest**

At the outset, this Court notes that RGVFCU's Claims 10 and 12 are properly treated as 910 claims in Section 5 of Debtors' Amended Plan because the Civic and Camaro are motor vehicles personally used by Debtors acquired within 910 days of filing the petition. *Compare* [ECF No. 1] *with* [Claim No. 10-1] *and* [Claim No. 12-1]. Thus, the issue is whether

RGVFCU's Cross-Collateralized Loans are properly treated as wholly unsecured claims under Section 8 of the Amended Plan.  *See* [ECF No. 23 at 8].  Further it is undisputed that both the Civic and Camaro are the Debtors' personal vehicles.  [ECF No. 22 at 1].  Therefore, in order for the hanging paragraph to apply to the Cross-Collateralized Loans, this Court must determine whether the loans are secured by a purchase-money security interest.  *In re Dale*, 582 F.3d at 570 (examining whether the purchase-money security interest exception of the hanging paragraph applies to claim portions used to pay off negative equity).

Notably, the term "purchase-money security interest" is not defined by the Code.  In fact, the term is used only one other time in the Code.  11 U.S.C. § 522(f).[3]  The Fifth Circuit addressed the definition of "purchase-money security interest" by engaging in thorough statutory interpretation.  *In re Dale*, 582 F.3d at 573–75.  "Statutory construction, of course, begins with the plain language of the statute."  *Id.* at 573 (citing *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 450 (2002)).  Acknowledging that "purchase-money security interest" is a term of art; the Fifth Circuit followed the majority of courts and determined that the UCC law of the state in question "must be used to define the hanging paragraph's phrase 'purchase-money security interest.'"  *In re Dale*, 582 F.3d at 573 (noting that "[i]t is common in the bankruptcy context to look to state law to define security interests created under state law").

As in *Dale*, Texas law is the relevant state law to apply in this case.  *Compare id. with* [ECF No. 23 at 13] (listing RGVFCU's address as Harlingen, Texas).  In somewhat circular fashion, Texas law defines a "purchase-money security interest" as a security interest in goods that are "purchase-money collateral," while defining "purchase-money collateral" as goods that

---

[3] Section 522(f)(1)(B) provides debtors the opportunity to avoid liens on a variety of interests if the lien is "a nonpossessory, nonpurchase-money security interest" in household furnishing and goods, health aids, and professional books and tools of the trade.

secure a "purchase-money obligation."  Tex. Bus. & Com. Code § 9.103(a).  Texas law defines

"purchase-money obligation" as "an obligation . . . incurred as all or part of the price of the

collateral or for value given to enable the debtor to acquire rights in or the use of the collateral if

the value is in fact so used."  *Id.*; *see also In re Raygoza*, 556 B.R. 813, 821 (Bankr. S.D. Tex.

2016) (holding that a debt is "incurred [when] there is a legal obligation to pay").  Additionally,

"[a] security interest in goods is a purchase-money security interest to the extent that the goods

are purchase-money collateral with respect to that security interest."  Tex. Bus. & Com. Code

§ 9.103(b)(1).   Utilizing these definitions, the Fifth Circuit found that the definition of

"purchase-money obligation" is two-pronged: "(i) the price of the collateral, and (ii) value given

to enable the debtor to acquire rights in or use of the collateral."  *In re Dale*, 582 F.3d at 573–74

(following the rulings of three other circuits and noting that "the creditor prevails if the debt at

issue satisfies either prong"); *see, e.g.*, *In re Price*, 562 F.3d 618, 625–26 (4th Cir. 2009); *In re*

*Ford*, 574 F.3d 1279, 1279 (10th Cir. 2009); *In re Graupner*, 537 F.3d 1295, 1301–02 (11th Cir.

2008); *see also In re Brodowski*, 391 B.R. 393, 398 (Bankr. S.D. Tex. 2008) (looking to the

definition of "purchase-money obligation" in Tex. Bus. & Com. Code § 9.103 to determine

whether a creditor holds a purchase-money security interest).  Additionally, the Fifth Circuit

acknowledges the important guidance provided by Official Comment 3 to the UCC,[4] noting that

"Official UCC Comments are by far the most useful aids to interpretation and construction."  *In*

---

[4] The Comment provides:

> As used in subsection (a)(2), the definition of "purchase-money obligation," the "price" of
> collateral or the "value given to enable" includes obligations for expenses incurred in connection
> with acquiring rights in the collateral, sales taxes, duties, finance charges, interest, freight charges,
> costs of storage in transit, demurrage, administrative charges, expenses of collection and
> enforcement, attorney's fees, and other similar obligations.

Tex. Bus. Com. Code § 9.103, Official Comment 3.

*re Dale*, 582 F.3d at 574 (quoting *Weathersby v. Gore*, 556 F.2d 1247, 1256 (5th Cir. 1977)).

Moreover, Official Comment 3 provides that a "purchase-money security interest requires a

close nexus between the acquisition of collateral and the secured obligation."  Tex. Bus. Com.

Code § 9.103, Official Comment 3.

Thus, this Court must determine if the Cross-Collateralized Loans satisfy either prong of

the "purchase-money obligation" definition.  The Fifth Circuit specifically notes that "certain

expenses that might not otherwise come within the common understanding of 'price' such as

'freight charges,' 'demurrage,' 'administrative charges,' 'expenses of collection and

enforcement,' and 'attorney's fees'" are to be included in the definition of "price" and "value to

enable" based on the statutory language and the Comment.  *In re Dale*, 582 F.3d at 574

(dispelling "any notion that 'price' and 'value given' are limited to the price tag of the vehicle

standing alone").  Additionally, the Fifth Circuit notes that "the listed expenses in Comment 3

have no common feature beyond an attenuated connection to the acquisition or maintenance of

the vehicle."  *Id.* at 574.

First, this Court turns to the loan cross-collateralized with the Civic.  *See* [Claim No. 7-

1].  In this case, both Debtors and RGVFCU indicate that the value of the Civic is $15,950.00.

[ECF No. 22 at 1]; [Claim No. 10-1] (listing the original amount financed for the Civic as

$20,110.00 and the current amount of the claim as $18,001.05).  Claim No. 7 is listed in the

amount of $1,704.50 and the basis of the Claim is noted as "money loaned/cross collateralized

with 2015 Honda Civic."  [Claim No. 7-1 at 2].  Although the Civic's price tag is not the only

consideration, the amount RGVFCU asserts in Claim No. 7 is dramatically lower than the

original amount Debtors financed to purchase the Civic, which was enough to cover the entire

purchase price.  *Compare id.* at 4 *with* [Claim No. 10-1 at 4].  Further, there is not a scintilla of evidence before this Court that the cross-collateralized loan in Claim No. 7 was used to pay expenses that have even "an attenuated connection to the acquisition or maintenance of the vehicle."  *See In re Dale*, 528 F.3d at 574–75 (finding that negative equity financing, gap insurance, and extended warranties were incurred "in connection with the buyer's goal of acquiring rights in the collateral").  Without evidence that Debtors entered into the loan cross-collateralized with the Civic in order to acquire or maintain the Civic, this Court finds that the loan in Claim No. 7 cannot be considered for the "price of the collateral" to qualify the loan as a "purchase-money obligation."  *But see id.* at 574.

Despite both loans being executed on August 14, 2015, Claim No. 7 and Claim No. 10 are based on separate Loan and Security Agreements.  *Compare* [Claim No. 7-1 at 4-6] *with* [Claim No. 10-1 at 4-6].  Moreover, Claim No. 10 includes the Texas Certificate of Title, as well as the NADA Vehicle Information pertaining to the Civic, which indicates that the loan was specifically for purchase of the Civic.  *Id.* at 7–9.  Therefore, regardless of the fact that the loans were executed on the same day, no evidence is before this Court demonstrating a close nexus between the Debtors' acquisition of the Civic and the loan represented by Claim No. 7.  *But see In re Dale*, 528 F.3d at 575 (holding that the expenses for negative equity financing and gap insurance were contemporaneous with the debtor's purchase of the vehicle).  Without the close nexus required by § 9.103, the loan in Claim No. 7 cannot be "value given to enable the debtor to acquire rights in or use of the collateral" and, by extension, cannot be a "purchase-money obligation."  *See id.* at 573–74 (citing Tex. Bus. & Com. Code § 9.103(a)). Thus, this Court finds that Claim No. 7 is not secured by a purchase-money security interest and is not a 910 claim.

*See* Tex. Bus. & Com. Code § 9.103, Official Comment 3.

Having determined that the loan cross-collateralized with the Civic is not a purchase-money security interest, the Court must also consider whether the loans cross-collateralized with the Camaro are treated properly under the Debtors' Amended Plan.  The value of the Camaro is $18,600.00.  [ECF No. 22 at 1]; [Claim No. 12-1] (listing the original amount financed as $26,140.00 and the remaining claim amount as $24,109.02).  Claim Nos. 8, 9, 11, and 13 are all cross collateralized with the Camaro.  *See* [Claim Nos. 8-1, 9-1, 11-1, 13-1].  The amount of Claim No. 8 is $14,618.80.  [Claim No. 8-1 at 2].  The amount of Claim No. 9 is listed as $5,327.90.  [Claim No. 9-1 at 2].  RGVFCU lists the amount in Claim No. 11 as $3,024.64. [Claim No. 11-1 at 2].  Finally, the amount of Claim No. 13 is listed as $3,826.96.  [Claim No. 13-1 at 2].  In regards to the loans cross-collateralized with the Camaro, the amounts RGVFCU assert are significantly lower than the Camaro's purchase price, whereas the loan in Claim No. 12 covered the entire cost of refinancing the Camaro.  *Compare* [Claim No. 12-1 at 4] *with* [Claim No. 8-1 at 2] *and* [Claim No. 9-1 at 2] *and* [Claim No. 11-1 at 2] *and* [Claim No. 13-1 at 2].  Further, there is no evidence before this Court establishing that the Cross-Collateralized Loans effectuated the Debtors' goal of acquiring rights to the Camaro.  *But see In re Dale*, 582 F.3d at 575.  Therefore, this Court finds that the Cross-Collateralized Loans were not for the acquisition of the Camaro, pursuant to the requirements of a "purchase-money obligation."  *See* Tex. Bus. & Com. Code § 9.103(a).

Additionally, the Debtors entered into the secured loan with RGVFCU refinancing the Camaro on July 30, 2015, whereas the Cross-Collateralized Loans were entered into on July 20, 2015, April 7, 2016, April 18, 2016, and May 17, 2016, respectively.  *Compare* [Claim No. 12-1]

with [Claim No. 13-1] *and* [Claim No. 8-1] *and* [Claim No. 9-1] *and* [Claim No. 11-1].  Three of the Cross-Collateralized Loans were entered into at least eight months after the Debtors refinanced the Camaro.  *Compare* [Claim No. 12-1] *with* [Claim No. 8-1] *and* [Claim No. 9-1] *and* [Claim No. 11-1].  Prior to entering into the loans represented by Claim Nos. 8, 9, and 11, Debtors already had rights in and exclusive use of the Camaro.  Therefore, these debts cannot be considered to be value given to acquire the Camaro.  *But see In re Dale*, 582 F.3d at 574. Similarly, Debtors entered into a loan with RGVFCU ten days prior to entering into the loan to refinance the Camaro.  *Compare* [Claim No. 13-1] *with* [Claim No. 12-1].  Once again, the Debtors did not seek to acquire rights in the Camaro when entering into the loan in Claim No. 13 as the loan came before Debtors refinanced the Camaro.  *Compare* [Claim No. 13-1] *with* [Claim No. 12-1].  Significantly, the Camaro refinancing loan contains separate loan documents, as well as the Texas Certificate of Title and the NADA Vehicle Information.   [Claim No. 12-1]. Conversely, each of the Cross-Collateralized Loans contain separate loan documents and do not contain any documents relevant to the Camaro.   *See* [Claim Nos. 8-1, 9-1, 11-1, 13-1]. Moreover, there is no evidence before this Court demonstrating a close nexus between the acquisition of the Camaro and the Cross-Collateralized Loans.  The disparity amongst the dates in which the Debtors entered into the Cross-Collateralized Loans and lack of evidence indicating otherwise suggests that there are no "attenuated connection[s] to the acquisition or maintenance" of the Camaro.  *But see In re Dale*, 582 F.3d at 574.  Without a demonstrated close nexus, this Court cannot find that the Cross-Collateralized Loans represent value given to enable the Debtors to acquire rights in the Camaro to be a "purchase-money obligation."  *But see id.* at 575.

Thus, none of the Cross-Collateralized Loans satisfy either prong of the definition of

"purchase-money obligation" under Tex. Bus. & Com. Code § 9.103(a). *See In re Dale*, 582 F.3d at 573–74. Accordingly, as the Cross-Collateralized Loans are not "purchase-money obligations," the Cross-Collateralized Loans are not "purchase money security interests" under the hanging paragraph. *See id.* Therefore, the Cross-Collateralized Loans are not 910 claims under the hanging paragraph. *But see id.* at 575 (finding that a loan for negative equity in a vehicle was a "purchase-money security interest" and the "hanging paragraph operate[d] to prevent bifurcation of th[e] debt").

**E. The Second Exception of the Hanging Paragraph Does Not Apply Because the Cross-Collateralized Loans are Not Purse-Money Security Interests.**

The inquiry into the applicability of the hanging paragraph requires addressing the second half of the statute. *See* § 1325(a). In addition to the prohibition against cramming down secured claims on vehicles purchased within 910 days of the petition, the hanging paragraph also prohibits cramming down a lien "if collateral for that debt consists of any other thing of value [and] the debt was incurred during the 1-year period preceding that filing." *Id.* Of the Cross-Collateralized Loans, Claim Nos. 7, 8, 9, and 11 involve debts incurred within one year of Debtor's petition, whereas the debt involved with Claim No. 13 was incurred outside the one year period. *Compare* [Claim No. 13-1] *with* [Claim No. 7-1] *and* [Claim No. 8-1] *and* [Claim No. 9-1] *and* [Claim No. 11-1]. At the outset, the hanging paragraph does not apply to Claim No. 13 because the Debtors entered into the loan more than a year prior to filing bankruptcy. *See* § 1325(a). Debtors contend that the second half of the hanging paragraph again requires a creditor to have a purchase money security interest in the collateral at issue in order to capitalize on the hanging paragraph's protections. [ECF No. 31 at 6–7]; *see also* § 1325(a) (reading that § 506 will not apply "if the creditor has a purchase money security interest securing the debt that

is the subject of the claim . . . if collateral for that debt consists of any other thing of value, if the debt was incurred during the 1-year period preceding that filing").

As illustrated by the Debtors, several courts have determined that the second half of the hanging paragraph requires a creditor to hold a purchase money security interest in the acquired collateral.  *In re Tanguay*, 427 B.R. 663, 671 (Bankr. E.D. Tenn. 2010) (applying the hanging paragraph to collateral "when a purchase money security interest secures the creditor's debt"); *In re Fernandez*, 412 B.R. 684, 687 (Bankr. D. N.J. 2009) (holding that "only purchase money security interests are protected from bifurcation by § 1325(a)"); *In re Quevedo*, 345 B.R. 238, 245 (Bankr. S.D. Cal. 2006) (evaluating the legislative history of the hanging paragraph and determining that it "protects only purchase money security interests").  Further, Collier notes that the second half of the paragraph involves a "purchase-money security interest for a debt incurred within one year preceding the filing of the petition, if the collateral consists of any other thing of value."  Collier on Bankruptcy, ¶ 1325.06 (16th ed. 2012) (stating that the hanging paragraph encompasses "two types of purchase-money security interests").  This Court agrees with the reasoning of the majority of courts that have considered this issue and finds that the entirety of the hanging paragraph only applies to purchase money security interests.  As determined above, the Cross-Collateralized Loans are not purchase money security interests.  Therefore, the second half of the hanging paragraph does not apply to the Cross-Collateralized Loans.  Accordingly, the Cross-Collateralized Loans are treated appropriately under the Amended Plan as wholly unsecured claims.  *See* [ECF No. 23 at 6].

**F.    The Hanging Paragraph's Second Exception Does Not Apply to the Cross-Collateralized Loans Because Motor Vehicles are not "Any Other Thing of Value"**

Having determined that the hanging paragraph requires collateral be secured by a

purchase money security interest, this Court is not compelled to conduct any further inquiry as the hanging paragraph does not apply. However, Debtors' Brief alleged that the second half of the hanging paragraph cannot apply because the Civic and Camaro are not "other thing[s] of value." [ECF No. 31 at 7]. Assuming, *arguendo*, that the second half of the hanging paragraph does not require a purchase-money security interest, this Court will consider whether the phrase "any other thing of value" includes motor vehicles. *See* § 1325(a).

Courts that have addressed this question often turn to the principal of statutory construction "that the specific governs the general." *In re Balsinde*, 2007 WL 4247642, at *2 (Bankr. S.D. Fla. Nov. 29, 2007) (quoting *Morales v. TWA*, 504 U.S. 374, 384 (1992)); *In re Horton*, 398 B.R. 73, 75 (Bankr. S.D. Fla. 2008). The *Balsinde* court held that because the first half of the hanging paragraph "specifically deals with motor vehicles" canons of statutory construction necessitate that "the second clause of the hanging paragraph is inapplicable to motor vehicles." 2007 WL 4247642, at *2. Further, the *Balsinde* court relied on the text of the hanging paragraph and focused on the word "other." *Id.* (finding that "[t]he word 'other' is [a] word that connotes differentiation [and] [i]n this case the statute differentiates between motor vehicles and any other type of collateral"). Finally, the *Balsinde* court noted that allowing motor vehicles to be included in the definition of "any other thing of value" would extend an "extra protection not contemplated by the code" to motor vehicle lenders. *Id.* at 3.

This Court agrees with the reasoning of the majority of courts and finds that the phrase "any other thing of value" in the hanging paragraph does not apply to motor vehicles. *See In re Ford*, 2008 WL 1925153, at *5–6 (Bankr. E.D. Wis. Apr. 29, 2008) (holding that "the second portion of the hanging paragraph does not apply" because the collateral at issue was a vehicle);

*In re Horton*, 398 B.R. at 76 (holding that "any ambiguity should be resolved in favor of limiting, not expanding[,] the exception" in the hanging paragraph); *In re Balsinde*, 2007 WL 4247642, at *3; *In re Hayes*, 376 B.R. 655, 665 (Bankr. M.D. Tenn. 2007) (noting that "Congress made a policy decision to treat motor vehicle collateral differently than any other thing of value"); *In re Hickey*, 370 B.R. 219, 221 (Bankr. D. Neb. 2007) (concluding that "[t]he second part of the paragraph pertains only to the situation where collateral consists of any other thing of value—that is, the collateral is not a motor vehicle acquired for the personal use of the debtor"). The Supreme Court has ruled that it is "a cardinal principle of statutory construction that we must give effect, if possible, to every clause and word of a statute." *Williams v. Taylor*, 529 U.S. 362, 404 (2002) (quoting *United States v. Menasche*, 348 U.S. 528, 538–39 (1955)). Therefore, courts should be "reluctant to treat statutory terms as surplusage in any stage." *Duncan v. Walker*, 533 U.S. 167, 174 (2001). Here, the Court can and must "give effect" to the word 'other'. *See Williams*, 529 U.S. at 404. Including motor vehicles within "any other thing of value" eliminates the effect of the word 'other' in the hanging paragraph. 'Other' is defined as "being the one (as of two or more) remaining or not included" and as "being the one or ones distinct from that or those first mentioned or implied." *Other*, Merriam-Webster Dictionary (11th ed. 2014). Motor vehicles acquired for the debtor's personal use are included and mentioned in the hanging paragraph, whereas "any other thing of value" remains distinct. *See* § 1325(a). Thus, following the reasoning of the majority of courts and the canons of statutory construction, this Court holds that the phrase "any other thing of value" does not apply to motor vehicles. *See In re Balsinde*, 2007 WL 4247642, at *3. The opposite holding would result in treating 'other' as "surplusage" in the hanging paragraph. *See generally Duncan*, 533 U.S. at

174.  Therefore, the Cross-Collateralized Loans are not subject to the hanging paragraph because the collateral in question are motor vehicles.  *See In re Balsinde*, 2007 WL 4247642, at *3.

### V. CONCLUSION

Debtors seek confirmation of their Amended Plan, which seeks to pay several loans cross-collateralized with two personal vehicles as wholly unsecured.  [ECF No. 23 at 6].  This Court finds that the Cross-Collateralized Loans are not subject to the hanging paragraph and therefore may be bifurcated and crammed down accordingly.  At the outset, neither exception under the hanging paragraph applies to the Cross-Collateralized Loans because the creditor does not have a purchase-money security interest in the loans.  *See In re Dale*, 582 F.3d at 573-74; Tex. Bus. & Com. Code § 9.103.  Additionally, the second exception of the hanging paragraph does not apply to the Cross-Collateralized Loans entered into within one-year of Debtors' bankruptcy because motor vehicles are excluded from the phrase "any other thing of value."  *In re Balsinde*, 2007 WL 4247642, at *3.  Therefore, the Debtors are free to bifurcate and cramdown the Cross-Collateralized Loans.  § 1325(a)(5).  Consequently, Debtors' Amended Chapter 13 Plan, [ECF No. 23], is hereby **CONFIRMED**.  Accordingly, the Trustee's Motion to Dismiss or Convert the Case, [ECF No. 21], is hereby **DENIED**.

An Order consistent with this Memorandum Opinion will be entered on the docket simultaneously herewith.

SIGNED 01/31/2017.

Eduardo V. Rodriguez
United States Bankruptcy Judge